IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 08-cv-002107-PAB-MJW

JOHN DAVIS,

      Plaintiff,

v.

CITY OF AURORA, a Home Rule Municipality,
by and through its governing body the City Council,
DANIEL J. OATES, individually and in his official capacity as Chief of Police,
ED TAUER, individually and in his official capacity as Mayor,
DANIEL BYRD, individually,
ERIC BUGGE, individually,
JEREMY SEXTON, individually,
GENNIFER WOLF, individually,
JILL BILL, individually,
MICHAEL WOODYARD, individually, and
DONALD AINSWORTH, individually,

      Defendants.

_____

## ORDER ON MOTIONS TO DISMISS
_____

      This civil rights case involves the alleged unlawful detention of plaintiff John

Davis by Aurora Police Department officers in response to a burglary report from

defendant Donald Ainsworth.  The matter is presently before the Court on the three

motions to dismiss [Docket Nos. 29, 30, 31] filed by state actor defendants City of

Aurora, Daniel J. Oates, Ed Tauer, Jill Bill, Daniel Byrd, Eric Bugge, Jeremy Sexton,

Gennifer Wolf, and Michael Woodyard.  Defendant Donald Ainsworth's motion to

dismiss [Docket No. 68] will be addressed in a separate order.  Plaintiff's claims against

the state actor defendants are brought under federal statutes and Constitutional

provisions and, as a result, the Court's jurisdiction over this matter is proper under 28 U.S.C. § 1331.

## I. BACKGROUND

### A.  Factual Background

The Court derives the following facts from plaintiff's amended complaint, *see generally* First Am. Compl. & Jury Demand [Docket No. 9] ("Am. Compl."), and presumes them to be true for the sake of the present motions.  *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).  Plaintiff John Davis is a black male in his fifties who resides in Aurora, Colorado.  Am. Compl. ¶ 7.  Just before noon on October 2, 2006, Mr. Davis, who is a licensed real estate broker associate, previewed a house located at 3697 South Cathay Circle in Aurora for a potential showing to clients.  Am. Compl. ¶¶ 7-8, 17.  Mr. Davis is himself a resident of this neighborhood.  Most of his neighbors are white.  Am. Compl. ¶¶ 17-18.

The house at 3697 South Cathay Circle was openly listed for sale; it had a "for sale" sign prominently displayed in the front yard, there was a lockbox containing a key so prospective agents and buyers could access the home, and the owners had vacated the premises, leaving only "staging" furniture.  Am. Compl. ¶¶ 19, 21, 23.  Prior to arriving at the South Cathay Circle property on October 2, 2006, Mr. Davis contacted the listing real estate broker and obtained permission to enter the home and the lockbox code which allowed him to access the keys to unlock the doors.  Am. Compl. ¶ 19.  Between 11:00 a.m. and 11:50 a.m., dressed in what he describes as "casual-professional dress" – " a sports shirt and casual pants" – plaintiff left his home and

walked approximately one block to the house at 3697 South Cathay Circle. Am. Compl. ¶¶ 21-22. As Mr. Davis approached the house, he had nothing suspicious in his hands, *see* Am. Compl. ¶ 23, and perhaps nothing at all, *see* Am. Compl. ¶ 26 (explaining that, when plaintiff left the house, he was "empty-handed"). Mr. Davis entered the code into the lockbox, retrieved the key, unlocked the front door, and entered the home. *See* Am. Compl. ¶ 23; *see also* Am. Compl. ¶¶ 25-27 (although plaintiff does not specifically state that he first entered through the front door, the Court infers as much from his later statements demonstrating that the lockbox was located near the front door). Plaintiff estimates that he spent five to ten minutes previewing the house and making mental notes to himself about the property. Am. Compl. ¶¶ 24-25.

While Mr. Davis was inside the home, defendant Ainsworth, who apparently resides across the street from the property Mr. Davis was previewing, called the Aurora Police Department to report that a black male was burglarizing the house at 3697 South Cathay Circle. Am. Compl. ¶¶ 8, 86. At the time Mr. Davis left the house at 3697 South Cathay Circle, it was midday. He locked the front door and returned the key to the lockbox. Am. Compl. ¶ 25. He had nothing in his hands. *See* Am. Compl. ¶¶ 25-26, 31. As soon as Mr. Davis turned from the front door, five or six Aurora police officers – defendants in this case – surrounded him with their guns pointed at him. *See* Am. Compl. ¶ 27. The officers did not ask plaintiff to identify himself or the purpose of his entering the house. *See* Am. Compl. ¶ 27. Instead, the officers shouted orders at plaintiff, acted in an aggressive and agitated fashion, and required plaintiff to raise his hands above his head. *See* Am. Compl. ¶¶ 27, 31. Plaintiff complied and attempted to

identify himself and to explain his reason for being there.  Am. Compl. ¶¶ 31-32.  The officers sternly told plaintiff either to "be quiet" or "shut-up" and ordered plaintiff to get on his knees, then to lie flat on the ground, and finally to place his hands behind his back.  *See* Am. Compl. ¶ 32-33.  Mr. Davis complied.  The officers cuffed his hands behind his back, "physically manhandled" him, and twisted and placed him in a sitting position.  Am. Compl. ¶ 34.  Plaintiff did not resist any of the police officers' orders or instructions, either before or after the officers drew their guns and pointed them at him. *See* Am. Compl. ¶¶ 30-31.

Once Mr. Davis was handcuffed and sitting, the officers began questioning him, while continuing to point their guns at him.  *See* Am. Compl. ¶ 35.  Mr. Davis explained that he was a real estate broker who had permission to view the residence.  Am. Compl. ¶ 35.  He gave the officers the lockbox code, which two of the officers used to obtain the key, enter the house, and search the premises.  Am. Compl. ¶¶ 35-36.  Mr. Davis remained sitting in the front yard, handcuffed and at gunpoint, while the two officers searched the home.  Am. Compl. ¶ 36.  The two officers failed to uncover any evidence of criminal activity inside the house.  Am. Compl. ¶ 37.  Upon their return, officers permitted plaintiff to call the listing real estate agent for the property in an attempt to verify plaintiff's lawful presence on the premises.  Am. Compl. ¶ 37.  The officers removed the handcuffs from Mr. Davis in order for him to make this telephone call, but forced him to remain on his knees in the middle of the front yard while an unspecified number of officers continued to point their firearms at him.  Am. Compl. ¶ 37.  The listing agent confirmed that Mr. Davis was authorized to be at the residence.

Am. Compl. ¶ 37. Only at this point did the officers holster their weapons and permit Mr. Davis to stand up. Am. Compl. ¶ 37.

Mr. Davis asked the officers why they treated him as they did. Am. Compl. ¶ 38. According to the amended complaint, the officers stated that such situations were routinely handled in this manner and that plaintiff could contact their police chief with any concerns. Am. Compl. ¶ 38. Plaintiff asserts that his experience resulted, at least in part, from the fact that "[f]or blacks who are observed in white neighborhoods situated in the City of Aurora, there is in place an official or unofficial policy, practice, custom and usage of automatic suspicion and presumption of illegal purposes and criminal intent." Am. Compl. ¶ 42. Mr. Davis alleges further that "[n]o such presumption exists for whites in black neighborhoods, or for whites in white neighborhoods" and that the alleged "policy, custom, practice or usage within the Aurora Police Department . . . has been sanctioned by the City, the Mayor and the Chief of Police." Am. Compl. ¶ 42. Furthermore, according to plaintiff, "similarly situated white real estate agents and brokers who have previewed or shown 3697 S[outh] Cathay Circle to clients have not been detained at gunpoint, questioned, handcuffed or restrained by the Aurora police, as was Plaintiff." Am. Compl. ¶ 43. Finally, plaintiff avers that others have complained about the Aurora Police Department's racially-motivated practices and policy, but that these complaints went unaddressed. Am. Compl. ¶ 67.

### B. Procedural Background

Mr. Davis filed his complaint in this action on September 30, 2008 [Docket No. 1], which he later amended on December 12, 2008, *see generally* Am. Compl. The amended complaint asserts seven claims and names ten defendants: the City of

Aurora, Daniel J. Oates, Ed Tauer, Jill Bill, Eric Bugge, Daniel Byrd, Jeremy Sexton, Gennifer Wolf, Michael Woodyard, and Donald Ainsworth.  Plaintiff's first claim for relief alleges a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution by the Aurora police officers and employees involved in the October 2, 2006 incident, namely, defendants Bill, Bugge, Byrd, Sexton, Wolf, and Woodyard.  Am. Compl. at 10-11.  Plaintiff's first claim is asserted against these defendants in their individual capacities.  The second claim alleges that these same defendants – again, in their individual capacities – violated the Fourth and Fourteenth Amendments through a "[d]eprivation of [l]iberty, [s]ecurity of [o]ne's [p]erson and [i]llegal [s]eizure . . . ."  Am. Compl. at 11-12.

Plaintiff's third claim is also an equal-protection claim, this one asserted against the City of Aurora, Aurora's mayor Ed Tauer, in his official capacity, and Aurora's Police Chief Daniel Oates in his individual and official capacities.  Am. Compl. at 12-14.  The fourth claim – similar to claim two – complains of a deprivation of liberty, security of one's person, and illegal seizure.  Plaintiff asserts claim four against the City of Aurora, Mayor Tauer, in his individual and official capacities, and Police Chief Oates, in his individual and official capacities.  Plaintiff asserts the remaining claims – five through seven – against defendant Ainsworth only.  As a result, these claims are not at issue in the context of the present motions.  *See* Am. Compl. at 16-18.

On January 27 and 29, 2009, the defendants, with the exception of Mr. Ainsworth, filed three motions to dismiss plaintiff's claims.  The first motion, filed by defendants Byrd, Bugge, Sexton, Wolf, and Woodyard, contests the individual capacity

claims in which they are named.[1]  *See* Mot. by Defs. Byrd, Bugge, Sexton, Wolf and Woodyard to Dismiss Compl. [Docket No. 29] ("Police Officer Defs.' Mot. to Dismiss"). Mr. Davis filed a response to this motion [Docket No. 45], to which defendants Bugge, Byrd, Sexton, Wolf, and Woodyard replied [Docket No. 53].  Defendants Oates and Tauer filed a motion to dismiss the individual capacity claims in which they are named in plaintiff's amended complaint.  *See* Defs. Daniel J. Oates & Ed Tauer's Mot. to Dismiss Pursuant to F.R.C.P. 12(b)(6) Based upon Qualified Immunity [Docket No. 30] ("Defs. Oates & Tauer's Mot. to Dismiss").  Mr. Davis filed a response to this motion [Docket No. 46], to which defendants Oates and Tauer replied [Docket No. 52].  Finally, defendant Bill, in her individual capacity, the City of Aurora, and defendants Oates and Tauer, in their official capacities, filed a separate motion to dismiss.  *See* Mot. by Def. Bill, All Aurora Defs. in Their Official Capacities, & Def. City to Dismiss Compl. [Docket No. 31] ("Def. Bill & Official Capacity Mot. to Dismiss").  Mr. Davis filed a response to this motion [Docket No. 47], to which these defendants replied [Docket No. 56]. Because the motions divide up plaintiff's claims in a way that is not entirely intuitive, I approach the motions to dismiss by addressing their applicability in the context of each of plaintiff's claims.

---

[1] This motion also argues that the claims against the City of Aurora and defendants Tauer and Oates should be dismissed.  *See* Police Officer Defs.' Mot. to Dismiss at 11-12.  However, it is not clear on what grounds these individual defendants believe they have the standing to challenge claims asserted against other defendants. The City of Aurora, Mayor Tauer, and Chief Oates filed their own motions to dismiss. The Court, therefore, addresses the claims against these defendants in that context only.

## II. ANALYSIS

### A. Equal-Protection Claim Against Defendants Bill, Bugge, Byrd, Sexton, Wolf, and Woodyard

Defendants Bugge, Byrd, Sexton, Wolf, and Woodyard seek dismissal of plaintiff's first claim for relief (Equal Protection) under Federal Rule of Civil Procedure 12(b)(6). *See* Police Officer Defs.' Mot. to Dismiss at 2-4. These defendants contend that, as a general matter, plaintiff has failed to state a viable equal-protection claim. Defendant Bill, in her separate motion, joins these defendants and adopts their reasoning without further argument. *See* Def. Bill & Official Capacity Mot. to Dismiss at 2.

#### *1. Legal Standard – Federal Rule of Civil Procedure 12(b)(6)*

Dismissal of a claim under Rule 12(b)(6) is appropriate where the plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). For a complaint to state a claim, it must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). Rule 8(a)'s "short and plain statement" mandate requires that a plaintiff allege enough factual matter that, taken as true, makes his "claim to relief . . . plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's Complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003). In doing so, the Court "must

accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). At the same time, however, a court need not accept conclusory allegations in the complaint. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erikson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (omission marks omitted). The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Bryson*, 534 F.3d at 1286.

However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1950 (2009) (internal quotation marks and alteration marks omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alteration marks omitted).

### 2. Pleading an Equal-Protection Claim

Mr. Davis' amended complaint contains factual averments that appear to be inconsistent. On the one hand, he avers that his treatment at the hands of the Aurora

police on October 2, 2006 was due to "an official or unofficial policy, practice, custom and usage of automatic suspicion and presumption of illegal purposes and criminal intent" toward black citizens, a presumption which does not exist for Mr. Davis' white counterparts.  Am. Compl. ¶¶ 42-43.  In his equal-protection claim against defendants Bill, Bugge, Byrd, Sexton, Wolf, and Woodyard, plaintiff alleges that these defendants "violated [p]laintiff's right to equal protection by practicing and implementing an illegal policy, custom, practice and usage of racial profiling and racial stereotyping practice that denied [p]laintiff rights, privileges and liberties that are afforded white citizens."  Am. Compl. ¶ 54.  Plaintiff also states that "[t]he intentionally discriminatory actions of [d]efendant police officers denied to the [p]laintiff equal protection and treatment under the law and placed [p]laintiff in the position or role of a second class citizen, who was automatically suspected of criminal activity and presumed to have committed criminal activity because of his color (i.e., race)."  Am. Compl. ¶ 55.

On the other hand, Mr. Davis also alleges, later in his complaint, facts which appear to be at odds with his equal-protection theory.  In the context of his Fourth and Fourteenth Amendment Claims against defendants Oates and Tauer in claim four, plaintiff alleges that

> [d]efendants City of Aurora, Aurora City Mayor Tauer and Aurora City Police Chief Oates have created, or allowed the creation, promulgation, implementation and enforcement of an unconstitutional policy, custom or practice that requires Aurora City police officers, upon a report of a suspected burglary to unconstitutionally seize the subject without any objection [sic] criteria. This seizure includes automatically pointing guns at persons suspected of a burglary, forcing or taking the suspect to the ground, to [sic] handcuffing the suspect, and detaining the suspect at gunpoint and other actions that amount to an arrest.

Am. Compl. ¶ 77. In case there was any doubt about the extent of this alleged policy, plaintiff elaborates that "this policy, custom or practice applies in all situations where a report of a burglary is made, without exception" and that "*no one*, under this policy, is immune from a seizure that exceeds permissible constitutional standards." Am Compl. ¶ 78 (emphasis in original). These latter averments undermine plaintiff's allegations that his encounter with the defendant police officers resulted from a policy, custom, or practice which employs racial profiling and racial stereotyping.

To plead a plausible equal-protection claim under his proposed theory, plaintiff must not only allege that at the time of the incident there existed a constitutionally impermissible policy, custom, or practice, he must also show that the policy in question caused his injuries. This causation requirement is rooted in at least two sources. First, under the Equal Protection Clause, there must be discriminatory intent behind the allegedly unlawful act. *See Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003); *see also Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265-66 (1977). "The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision." *Marshall*, 345 F.3d at 1168 (citing *Village of Arlington Heights,* 429 U.S. at 265-66). If, as plaintiff alleges, the police officers in this case were motivated by a race-neutral policy directed at burglary suspects, the officers lack the necessary intent under the Equal Protection Clause.[2]

---

[2] Plaintiff has not suggested that his equal-protection claim relates in any way to the alleged policy regarding burglary suspects.

Plaintiff's duty to allege causation more importantly implicates this Court's jurisdiction. In order to have standing to invoke federal court jurisdiction, a plaintiff must demonstrate three things:

> (1) "injury in fact," by which we mean an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury "fairly can be traced to the challenged action of the defendant," and has not resulted "from the independent action of some third party not before the court"; and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the "prospect of obtaining relief from the injury as a result of a favorable ruling" is not "too speculative."

*In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1101 (10th Cir. 2001) (quoting *Northeastern Fla. Chapter of the Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 663-64 (1993)).

Mr. Davis' own allegations undermine any claim that the second prong of the standing analysis – a causal relationship between the injury and the challenged conduct – is present in this case. The facts, as alleged by Mr. Davis, demonstrate that while the Aurora Police Department may have employed a racially-motivated policy, custom, or practice, such a policy or practice did not cause his mistreatment. He claims that all persons, "without exception," are treated similarly where "a report of a burglary is made." Plaintiff alleges that the officers themselves informed him that they routinely handled burglary calls in this way. *See* Am. Compl. ¶ 38. Plaintiff's complaint does not address this apparent inconsistency, nor did plaintiff respond after defendants Oates and Tauer raised this issue in their motion to dismiss. *See* Defs. Oates & Tauer's Mot.

to Dismiss at 5-6; *see also* Resp. in Opp'n to Tauer and Oates' Mot. to Dismiss Based upon Qualified Immunity [Docket No. 46].

"The Fourteenth Amendment guarantee of equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'" *Straley v. Utah Bd. of Pardons*, 582 F.3d 1208, 1215 (10th Cir. 2009) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Plaintiff's allegations in his amended complaint, as they now stand, demonstrate that the defendant police officers treated all similarly situated individuals, namely burglary suspects, the same way, regardless of their race. Without a clearer indication from Mr. Davis on how he reconciles his seemingly incongruous factual contentions, the Court accepts his averments that the Aurora Police Department had in place a policy, custom, or practice that caused its officers to treat all burglary suspects the way the defendant police officers treated Mr. Davis on October 2, 2006. Without a contention that the alleged racially-biased policy was a concurrent, overriding, or alternative motivating force behind the events of October 2, 2006, plaintiff lacks standing to challenge a policy which, according to the facts of this case, had no impact on plaintiff's situation or alleged injuries. As a consequence, the Court lacks subject-matter jurisdiction over plaintiff's equal-protection claim against defendants Bill, Bugge, Byrd, Sexton, Wolf, and Woodyard and plaintiff's first claim for relief is dismissed without prejudice pursuant to Rule 12(b)(1).

**B. Fourth Amendment Claim Against Defendants Bill, Bugge, Byrd, Sexton, Wolf, and Woodyard**

Defendants Bugge, Byrd, Sexton, Wolf, and Woodyard also seek dismissal of plaintiff's second claim for relief – for the alleged deprivation of liberty, security of one's person and illegal seizure – under Federal Rule of Civil Procedure 12(b)(6). *See* Police Officer Defs.' Mot. to Dismiss at 4-11. These defendants contend that they are entitled to qualified immunity on Mr. Davis' Fourth and Fourteenth Amendment claim because Mr. Davis has failed to sufficiently allege that the defendants violated one of Mr. Davis' clearly established rights. Defendant Bill, in her separate motion, joins these defendants and adopts their reasoning without further argument. *See* Def. Bill & Official Capacity Mot. to Dismiss at 2.

### 1. Preliminary Matter – Nature of Plaintiff's Second Claim

There appears to be some confusion as to the exact nature of plaintiff's second claim for relief. Undoubtedly, this confusion is rooted in the somewhat vague title under which the claim is advanced: "Violation of 4th and 14th Amendments – Deprivation of Liberty, Security of One's Person and Illegal Seizure Against Defendants Byrd, Bugge, Sexton, Wolf, Bill and Woodyard in their individual capacities." Am. Compl. at 11. One area of uncertainty has to do with the constitutional provision at stake. Defendants Bugge, Byrd, Sexton, Wolf, and Woodyard interpret plaintiff's reference to the Fourteenth Amendment as possibly alleging a due process violation. *See* Police Officer Defs.' Mot. to Dismiss at 11. However, nothing in the amended complaint indicates that plaintiff intended to bring such a claim. Rather, the reference to the Fourteenth Amendment appears to invoke the doctrine that the Fourth Amendment is applicable to

state actors through incorporation into the Fourteenth Amendment's Due Process Clause. *See United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1225 n. 1 (10th Cir. 2008) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)). Due to this fact, and for ease of reference going forward, I refer to Mr. Davis' second and fourth claims in terms of the Fourth Amendment only.

### *2. Legal Standard – Qualified Immunity*

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Upon a public official's assertion of a qualified immunity defense, plaintiff bears a "heavy burden" under a two-pronged analysis. *Buck v. City of Albuquerque,* 549 F.3d 1269, 1277 (10th Cir. 2008). Under the first prong, the plaintiff must "establish that the defendant's actions violated a constitutional or statutory right." *Smith v. Cochran,* 339 F.3d 1205, 1211 (10th Cir. 2003) (quoting *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1185 (10th Cir. 2001)). Under the second prong, the plaintiff must establish that the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan,* --- U.S. ----, 129 S. Ct. 808 (2009). The Supreme Court has held that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand." *Pearson,* 129 S. Ct. at 818. The practical effect of *Pearson*'s directive on the qualified-immunity analysis is that for a plaintiff to prevail, both prongs must be adequately established; however, for a defendant to prevail, inadequacy with respect to either prong will suffice. *See Shroff v. Spellman*, --- F.3d ----, 2010 WL 1039799, at *8 (10th Cir. 2010).

The determination of whether a violation occurred under the first prong of the qualified immunity analysis turns on the substantive law regarding that right. *See*, *e.g.*, *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282-83 (10th Cir. 2007). On the other hand, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Casey*, 509 F.3d at 1283-84 (quoting *Saucier*, 533 U.S. at 202); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits."[3] *Gann v. Cline,* 519 F.3d 1090, 1092 (10th Cir. 2008) (quoting *Anderson v. Blake,* 469 F.3d 910, 914 (10th Cir. 2006)) (internal quotation marks omitted). However, "contrary authority from other circuits does not preclude a finding that the law

---

[3] There is some question as to whether the proper consideration is "the weight of authority from other *circuits*" or "from other *courts*," as the standard was first articulated. *E.g.*, *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992); *see Prison Legal News, Inc. v. Simmons*, 401 F. Supp. 2d 1181, 1189-90 (D. Kan. 2005). In any event, "although the [Tenth Circuit] may be willing to consider cases from courts beyond the federal appellate courts, the focus should normally be on cases decided by other circuits." *Prison Legal News*, 401 F. Supp. 2d 1191.

in this circuit was clearly established, if the contrary authority can be distinguished."

*Currier v. Doran,* 242 F.3d 905, 923 (10th Cir. 2001).

In considering what law is clearly established, factual novelty alone does not automatically provide a state official with the protections of qualified immunity. *See Casey,* 509 F.3d at 1284 (noting that in the Fourth Amendment context, "there will almost never be a previously published opinion involving exactly the same circumstances"); *Blake,* 469 F.3d at 914 ("[A] general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." (internal quotation marks and alteration marks omitted)). The Tenth Circuit employs a "sliding scale" in identifying clearly established law: "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey,* 509 F.3d at 1284 (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004)).

That being said, "[q]ualified immunity operates . . . to protect officers from the sometimes hazy border between [unconstitutional and lawful conduct] and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206 (internal citation and quotation marks omitted). As a result, qualified immunity provides "ample room for mistaken judgments," *Malley v. Briggs*, 475 U.S. 335, 343 (1986); *cf. Whitington v. Lawson*, No. 06-cv-00759-LTB-CBS, 2009 WL 3497791, at *3 (D. Colo. Oct. 29, 2009) ("Qualified immunity exists so long as reasonable officials in the same situation as the defendants could disagree on the

appropriate course of action to follow." (citing *Holland*, 268 F.3d at 1186)).  However, defendants still must make reasonable applications of the prevailing law to their own circumstances.  *Currier*, 242 F.3d at 923 (internal quotation marks omitted).

Ultimately, "[q]ualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson*, 129 S. Ct. at 815.  Qualified immunity provides a defense to trial and the other burdens of litigation such as discovery, rather than just liability. *See Saucier*, 533 U.S. at 200.  Therefore, a court is to resolve questions of qualified immunity at the earliest possible stage of litigation.  *Anderson*, 483 U.S. at 646 n.6.

While *Pearson* allows the Court to focus on the dispositive prong of the qualified immunity analysis, if there is one, the discretion imparted by *Pearson* has little practical utility in the present case.  Where, as here, a plaintiff asserts supervisory and municipal liability claims which rest upon an underlying constitutional violation, nothing is gained by proceeding straight to the "clearly established" prong of the analysis.  Therefore, in addressing plaintiff's claims below, I address first whether plaintiff sufficiently pled that defendants Bill, Bugge, Byrd, Sexton, Wolf, and Woodyard have violated the Fourth Amendment.

### 2. *Violation of Clearly Established Law*

The Fourth Amendment protects citizens from 'unreasonable searches and seizures' conducted by either state or federal government officials.  *United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009) (quoting U.S. Const., amend. IV).  Relevant

to the Fourth Amendment inquiry, "the Supreme Court has recognized three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *White*, 584 F.3d at 944-45 (internal quotation marks and alteration marks omitted).

While there is no debate among the parties that the defendant police officers "seized" Mr. Davis on October 2, 2006, they disagree about the type of seizure that occurred. Defendants contend that their encounter with Mr. Davis was the second type listed above, an investigative detention. Mr. Davis disagrees and asserts that defendants' actions amounted to a *de facto* arrest. The distinction is significant because, as noted above, it determines the level of suspicion or cause that the officers must have had in order to lawfully initiate the contact. *See White*, 584 F.3d at 945. Therefore, I first take up the issue of what type of police-citizen encounter transpired in the front yard of 3697 South Cathay Circle on October 2, 2006.

"An arrest is distinguished from an investigative *Terry* stop by the involuntary, highly intrusive nature of the encounter." *White*, 584 F.3d at 952 (quotation marks omitted). "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (quoting *Florida v. Royer*, 460 U.S. 491, 500

(1983)).  However, "because 'reasonableness' is the touchstone of Fourth Amendment analysis, the partition between investigative detentions and de facto arrests cannot be defined by any 'litmus-paper test.'"  *White*, 584 F.3d at 952 (quoting *Royer*, 460 U.S. at 506).

The Tenth Circuit noted in an en banc decision that "[t]he use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest."  *Cortez v. McCauley*, 478 F.3d 1108, 1115-16 (10th Cir. 2007) (en banc) (quotation marks and alteration marks omitted).  However, "[a]lthough effectuating a *Terry* stop by pointing guns at a suspect may elevate a seizure to an 'arrest' in most scenarios," it will not do so in all circumstances.  *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993).  Indeed, even the use of handcuffs and forcing an individual to lie on the ground will not necessarily transform an investigative detention into an arrest.  *See Perdue*, 8 F.3d at 1463; *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) ("Under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground."); *see also Fuchs v. Sanders*, 659 F. Supp. 2d 1136 (D. Colo. 2009).  These results rely on the fact that "[w]hile *Terry* stops generally must be fairly nonintrusive, officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures."  *Perdue*, 8 F.3d at 1462.

Investigative or "*Terry*" stops "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement

interests that they may be made on less than probable cause . . . ." *Michigan v. Summers*, 452 U.S. 692, 699 (1981). Inherent in this statement is the requirement that courts must balance the level of intrusion against the substantiality of the law enforcement interests precipitating it. Determining whether a seizure is properly characterized as an investigative stop or an arrest, therefore, requires the Court to analyze various factors against the totality of the facts. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) ("[I]f police officers' actions exceed what is reasonably necessary under the totality of the circumstances, the stop may only be justified by probable cause or consent."); *see also Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). Factors which other courts have considered and which are relevant to the present case include: (1) the duration of detention, *see, e.g.*, *Fuchs*, 659 F. Supp. 2d at 1146 (listing cases); (2) the number of detainees vis-a-vis the number of officers, *see, e.g.*, *Melendez-Garcia*, 28 F.3d at 1052 (discussing how *Perdue*, 8 F.3d at 1463, involved detention by two officers of various suspects in a remote area); *see also Fuchs*, 659 F. Supp. 2d at 1148 (single officer against unknown number of suspects in a vehicle); (3) environmental conditions, including time of day, *see, e.g*, *Melendez-Garcia*, 28 F.3d at 1052 (discussing how *Perdue*, 8 F.3d at 1463, involved a detention late at night in a remote area); (4) behavior of the detainee, including whether the detainee is cooperative or acting suspicious, *see, e.g.*, *Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1030-31 (10th Cir. 1997) (physically restraining detainee who was trying to flee did not transform investigative detention to an arrest); *Perdue*, 8 F.3d at 1463 (detaining individual at gunpoint, forcing him to lie on the

ground, and handcuffing him did not rise to the level of an arrest where individual tried to flee crime scene); (5) the seriousness of the suspected crime, *see, e.g*, *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993); *Novitsky*, 491 F.3d at 1255 (noting the fact that where there was no evidence that a crime had occurred, the reasonableness of the seizure was reduced); (6) the officers' reasonable suspicions regarding the threat posed by the suspect, especially whether or not the suspect is thought to be armed, *see, e.g.*, *United States v. Merritt*, 695 F.2d 1263 (10th Cir. 1982); and (7) the means by which the detention was effectuated, *see, e.g.*, *Cortez*, 478 F.3d at 1115-16; *Fuchs*, 659 F. Supp. 2d at 1147-49.[4]

Applying these factors to the present case, I find the totality of the circumstances, as they have been alleged in the amended complaint, indicate that the defendant police officers' continued detention of Mr. Davis became an arrest for Fourth Amendment purposes. While the officers' detention of Mr. Davis does not appear to have been excessively long and the defendant police officers appear to have worked diligently toward resolving any uncertainties regarding the situation, the exact duration of Mr. Davis' detention is unknown at this point. Ultimately, this fact is not material because, regardless of the duration, the Court finds that the other factors weigh in favor of finding that the officers effectuated an arrest. Five to six armed police officers surrounded an unarmed, empty-handed, well-dressed man who made no furtive gestures and fully complied with all orders. The officers were dispatched, as far as the

---

[4] Many of these factors are also considered in the analysis of whether the detention was reasonable under the circumstances and the applicable legal standard, *see, e.g.*, *Gallegos*, 114 F.3d 1024, 1029 (10th Cir. 1997).

Court can tell, on a "burglary in progress" call.  When they arrived, it was the middle of the day, there was a "for sale" sign in the front yard, and based on their proximity to the front door when Mr. Davis turned around, they likely saw him locking the front door and returning the key to the lockbox.  Finally, Mr. Davis immediately informed the police officers that he was, as the circumstances suggested, a real estate broker with a legitimate reason for being on the property.  Therefore, the second, third, and fourth factors described above all weigh in favor of characterizing their detention of Mr. Davis as an arrest.

However, even with all the facts described above, the defendant police officers could possibly have brandished their weapons, ordered Mr. Davis to lie on the ground, and handcuffed him without constituting an arrest.  "Since police officers should not be required to take unnecessary risks in performing their duties, they are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a *Terry* stop."  *Perdue*, 8 F.3d at 1462 (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985) (quotation marks and alteration marks omitted).  Burglaries are serious crimes and burglars are undoubtedly armed at times and pose significant threats to others.  *Cf. United States v. Bullock*, 510 F.3d 342, 346 (D.C. Cir. 2007) ("If an officer possesses reasonable suspicion that the detained suspect committed a violent or serious crime – such as murder, robbery, rape, *burglary*, assault with a weapon, or various drug offenses – the officer by definition is dealing with an individual reasonably suspected of committing a crime that involves or is associated with carrying or using a weapon.  In such cases, it logically and necessarily follows that the officer may reasonably conclude the suspect 'may be armed

23

and presently dangerous.'" (emphasis added)).  Therefore, an initial show of force in a situation described here will not, by itself, necessarily amount to an arrest.  *Cf. United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993) ("In holding that the use of firearms was reasonable under the circumstances, we stated that "[w]henever the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk that anyone will get hurt." (citing *United States v. Merritt*, 695 F.2d 1263, 1274 (10th Cir. 1982))).  As a result, the fifth and sixth factors weigh in favor of the defendant police officers' level of force, at least initially.

However, the seventh factor listed above – the means by which the detention was effectuated – convinces the Court that the defendant police officers conducted a *de facto* arrest of Mr. Davis on August 2, 2006.  Once Mr. Davis was on the ground and handcuffed, any potential threat he posed was alleviated.  At that point, any uncertainties regarding whether he was armed or would attempt to flee were effectively eliminated.  Nevertheless, the officers continued to point their guns at him.  Two officers then cleared the house and found no evidence of criminal activity and no potential accomplices.  Any threat to the officers from the house was therefore ruled out.  Yet, after clearing the house, the officers continued to point their guns at Mr. Davis while he sat or kneeled in the middle of the front yard, handcuffed.  Based on the totality of the facts presented, applied to the factors discussed above, the Court concludes that the defendant police officers' detention of Mr. Davis became a *de facto* arrest no later than the time the two officers had cleared the house and alleviated the threat which excused

the heightened "intrusions on the personal security" of Mr. Davis.  *Summers*, 452 U.S. at 699.

Furthermore, because the law upon which this conclusion is based is clearly established, no unfairness attends the holding of the defendant police officers to this conclusion.  Well before October 2, 2006, the Tenth Circuit had explained that the use of guns and handcuffs often would elevate an investigative detention into an arrest, requiring probable cause.  *See Perdue*, 8 F.3d at 1463.  While the Tenth Circuit had frequently permitted the use of guns and handcuffs, *see Gallegos*, 114 F.3d at 1030-31, police officers were on notice that doing so required a reasonably perceived threat to their safety, *see Melendez-Garcia*, 28 F.3d at 1052 ("[T]he use of force such as handcuffs and firearms is a far greater level of intrusion, and requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief' that the action taken was appropriate.").  Furthermore, at the time the defendant police officers detained Mr. Davis, the Tenth Circuit had held in a case that bears significance here that there were "no substantial grounds for a reasonable officer to conclude that there was legitimate justification for continuing to hold [detainees] directly at gunpoint after they had completely submitted to the . . . initial show of force," *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1197 (10th Cir. 2001).

With the question of how to characterize Mr. Davis' detention answered, the Court now turns to the issue of whether the police officer defendants had probable cause under the Fourth Amendment to make an arrest.  "It is well settled that a

police-citizen encounter which goes beyond the limits of a *Terry* stop is an arrest that must be supported by probable cause or consent to be valid." *Gallegos*, 114 F.3d at 1030. "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir.1995). Stated otherwise, "[p]robable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." *Cortez*, 478 F.3d at 1116.

While defendants Bugge, Byrd, Sexton, Wolf, and Woodyard dedicate most of their motion to dismiss to arguments which are premised on Mr. Davis' detention being an investigative detention, they do present a brief argument under an arrest scenario:

> [E]ven if the investigative detention of the Plaintiff was tantamount to a *de facto arrest* without probable cause in violation of the Fourth Amendment, the Aurora Police Officer Defendants could have reasonably assumed that their conduct was constitutional based on the status of the law governing detentions as articulated by the recent Tenth Circuit decisions cited above. At most, the Aurora Police Officer Defendants were reasonably mistaken as to the constitutionality of their investigatory detention; however, officers making such reasonable mistakes are still afforded the protections of qualified immunity.

Police Officer Defs.' Mot. to Dismiss at 10. Because the defendants based their motion on the faulty premise that their actions constituted an investigative stop, they have not fully briefed the issue of probable cause. With this in mind, I look to the arguments they have made and form the following conclusions.

The defendant police officers argue that defendant Ainsworth's call to the Aurora Police Department provided them with a sufficient basis for their seizure of Mr. Davis. Because the case is before the Court on a Rule 12(b)(6) motion, the Court is limited to the facts alleged and those positive inferences in favor of plaintiff. The amended complaint alleges only that defendant Ainsworth called to report a burglary and that the defendant police officers were dispatched to the scene. Under these allegations, the details of the report which the officers received are unknown.

Furthermore, the police officer defendants could not form probable cause based upon the report of a neighbor to the exclusion of all other facts available to them. *Cf. Cortez*, 478 F.3d at 1121 (a court must consider "what information the officers possessed against a backdrop of the known progress of their investigation, including the steps that had not been taken at the time [the plaintiff] was arrested."); *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1257 (10th Cir. 1998) (citing *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.")).

In the present case, the reasonableness of defendants' suspicions was at its height at the point they were informed of the burglary call. Once they arrived at the scene, those suspicions should have reasonably decreased. There was a "for sale" sign in the front yard of the property, meaning that it would not have been unusual for unfamiliar people to be entering the house to look at it. Instead of leaving through a window or more concealed back door, Mr. Davis walked out the front door in broad daylight. He appeared to have no contraband on his person. He then did something very unlike a typical burglar – he locked the door he left out of and returned the key to

27

the lockbox.  Locking the front door and returning the key is also inconsistent with other suspects being inside the house.  Once the officers confronted Mr. Davis, Mr. Davis was cooperative.  After the officers handcuffed him, Mr. Davis presented no risk of flight and made no effort to try to communicate with or warn any potential accomplices inside the house.  Mr. Davis told the officers almost immediately his true purpose for being at the property.  His story was supported by the fact that he had the correct lockbox code and that, following a search of the premises, there was nothing suggesting criminal activity.  With each step, the reasonableness of the officers' suspicions eroded. However, rather than scaling back the force they were using to detain Mr. Davis, they continued it until the listing agent confirmed Mr. Davis' story.  Therefore, the Court concludes that the officers lacked probable cause to arrest Mr. Davis after the house was cleared.  Based on the present record, plaintiff has pled a Fourth Amendment claim under which he is plausibly entitled to relief.

This conclusion is firmly rooted in the clearly established law of this circuit.  The Tenth Circuit in *Cortez v. McCauley* held that as of May 26, 2001, "[s]ettled law ma[de] it clear that probable cause is measured at the moment the arrest occurs and must derive from facts and circumstances based on reasonably trustworthy information." *Cortez*, 478 F.3d at 1121.  Furthermore, the police officers were on fair notice that they could not turn a blind eye to the facts undermining the basis for their suspicion or cause to detain Mr. Davis.  *See, e.g.*, *Baptiste*, 147 F.3d at 1259; *Romero*, 45 F.3d at 1476-77; *see also Cortez*, 478 F.3d at 1121-22.  The Court holds that, on the present record, plaintiff's second claim pleads a violation of clearly established law under the Fourth Amendment which plausibly entitles him to relief.  As a consequence,

defendants Bill, Bugge, Byrd, Sexton, Wolf, and Woodyard are not entitled to dismissal of the claim.

### C.  Equal-Protection Claim Against Defendants City of Aurora, Oates, and Tauer

Based on similar factual allegations that underpinned plaintiff's first claim, namely allegations regarding the existence of racial-profiling and racial-stereotyping policies, plaintiff brings an equal protection claim against the City of Aurora, Chief Oates, and Mayor Tauer.  However, for the same reasons discussed above under claim one, the Court lacks subject-matter jurisdiction over plaintiff's equal-protection claim against defendants City of Aurora, Oates, and Tauer.  As a result, plaintiff's third claim for relief also must be dismissed without prejudice pursuant to Rule 12(b)(1).

### D.  Fourth Amendment Claim Against Defendants City of Aurora, Oates, and Tauer

#### *1.  Individual Capacity Claims Against Defendants Oates and Tauer*

As mentioned earlier, Mr. Davis alleges in his amended complaint that "[d]efendants City of Aurora, Aurora City Mayor Tauer and Aurora City Police Chief Oates have created, or allowed the creation, promulgation, implementation and enforcement of an unconstitutional policy, custom or practice that requires Aurora City police officers, upon a report of a suspected burglary to unconstitutionally seize the subject without any objection [sic] criteria."  Am. Compl. ¶ 77.  Mr. Davis describes the alleged policy as dictating that "[t]his seizure includes automatically pointing guns at persons suspected of a burglary, forcing or taking the suspect to the ground, to handcuffing the suspect, and detaining the suspect at gunpoint and other actions that

amount to an arrest." Am. Compl. ¶ 77. Plaintiff also alleges that "[p]ursuant to this unconstitutional policy, custom or practice, Aurora police officers are trained not to use an objective standard when assessing the situation" and "[p]olice officers are trained to take action that is more restrictive then [sic] a mere investigatory stop based on suspicion." Am. Compl. ¶ 78. Plaintiff also alleges that "[t]his protocol is enforced and applied by Aurora police officers in circumstances where there is no probable cause to support the extreme measures and actions this policy requires . . . ." Am. Compl. ¶ 79.

Defendants Oates and Tauer contend that the individual capacity claims against them ought to be dismissed because the amended complaint "fails to allege their 'personal participation' in the alleged constitutional violation and fails to demonstrate an 'affirmative link' between the alleged [Aurora Police Department] policies and the [d]efendant officers' alleged wrongdoing." Defs. Oates & Tauer's Mot. to Dismiss at 11. These defendants also argue that the amended complaint fails to demonstrate that they "directed or had any actual knowledge of the alleged actions of Defendant police officers" and, therefore, a theory of supervisor liability may not be brought against them. Defs. Oates & Tauer's Mot. to Dismiss at 11. As a result, these defendants urge that they are entitled to qualified immunity.

In response, plaintiff makes clear that he seeks to impose liability on defendants Oates and Tauer to the extent that they established and maintained the policy or custom under which the officers were acting on October 2, 2006. In addition to the averments to this effect which are cited above, Mr. Davis alleges that "Aurora police officers with the permission and consent of Defendants Oates and Tauer are trained by the City of Aurora on this unconstitutional policy . . . ." Am. Compl. ¶ 80. Plaintiff also

claims that "[a]s a direct and proximate result of the aforementioned unlawful policy, its endorsement by [d]efendants City of Aurora, the Aurora City Mayor and the Aurora City police chief, and its use by the City's police force, [p]laintiff has suffered a violation of his 4th and 14th Amendment rights and the injury described above."  Am. Compl. ¶ 82.

As a threshold issue regarding this Fourth Amendment claim, I note that a supervisor "cannot be held liable in his individual capacity for implementing county policies or for the actions of county officers under a theory of supervisory liability, when there was no violation of [plaintiff's] constitutional rights."  *Martinez v. Beggs*, 563 F.3d 1082, 1092 (10th Cir. 2009).  Although ostensibly raising this issue in favor of the City of Aurora and defendants Oates and Tauer, in their official capacities, *see* Defs. Oates & Tauer's Mot. to Dismiss at 11, because these defendants broach the topic in their motion to dismiss the individual-capacity claims, the Court addresses it briefly here as well.  That being said, due to the Court's conclusions earlier in this order regarding the claims against the individual police officers, this defense is unavailing at the present time.

Turning now to defendants Oates and Tauer's other supervisory liability arguments, they correctly note that "[a]s a general matter, § 1983 does not recognize a concept of strict supervisor liability; the defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (citing *Jenkins v. Wood*, 81 F.3d 988, 994-95 (10th Cir.1996)).  "Yet in situations where an 'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise, the supervisor may be

personally liable." *Fogarty*, 523 F.3d at 1162 (quoting *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir.1993)) (some quotation marks omitted).

The exercise of control which may create the "affirmative link" does not need to be the sort of on-the-ground, moment-to-moment control that defendants appear to suggest. Rather, the establishment or utilization of an unconstitutional policy or custom can serve as the supervisor's "affirmative link" to the constitutional violation. *See Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988). Furthermore, the necessary "affirmative link" may arise where the supervisor "set in motion a series of events that he knew or reasonably should have known would cause his officers to violate [plaintiffs'] constitutional rights . . . ." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1291 (10th Cir. 2008) (agreeing with district court's conclusion to this effect). The Tenth Circuit in *Buck* distinguished *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001), where no such "affirmative link" was found. In *Holland,* by contrast, "plaintiffs did not show that defendants decided to use the SWAT team knowing that the SWAT team would use excessive force, intending to cause harm to any person, or that they instructed the SWAT team to use excessive force while conducting the raid." *Buck*, 549 F.3d at 1291 (quoting *Holland*, 268 F.3d at 1191 (10th Cir. 2001)) (alteration marks and omission marks omitted). Therefore, where an official with policymaking authority creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations which result from the policy's application.

In the present case, by alleging that defendants Oates and Tauer formed or acquiesced to the formation of the policy at issue, together with their ultimate endorsement and implementation of the policy, Davis has alleged a sufficient affirmative link between the personal participation of these defendants and the alleged constitutional deprivation suffered by Mr. Davis. Furthermore, these legal doctrines were clearly established by way of the above-cited cases well in advance of October 2, 2006. Therefore, defendants Oates and Tauer are not entitled to qualified immunity on the present record.

### 2. Claim Against City of Aurora and Official Capacity Claims

The City of Aurora and defendants Oates and Tauer, in their official capacities, filed a motion to dismiss raising a single argument: citing to *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), they argue that "a municipality cannot be held liable under § 1983 if the officer in fact inflicted no constitutional harm." Def. Bill & Official Capacity Mot. to Dismiss at 3 (alteration marks omitted); *see also Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) ("A county or sheriff in his official capacity cannot be held liable for constitutional violations when there was no underlying constitutional violation by any of its officers." (quotation marks omitted)). These arguments are dependent upon defendants Bugge, Byrd, Sexton, Wolf, Woodyard, Oates, and Tauer's success on their motions to dismiss plaintiff's Fourth Amendment claims. With those defendants having been unsuccessful in that regard, the derivative dismissal sought by the City of Aurora and defendants Oates and Tauer, in their official capacities, likewise fails.

## III. CONCLUSION

In accordance with the foregoing, it is

**ORDERED** that defendants City of Aurora, Daniel J. Oates, Ed Tauer, Jill Bill, Daniel Byrd, Eric Bugge, Jeremy Sexton, Gennifer Wolf, and Michael Woodyard's assorted motions to dismiss [Docket Nos. 29, 30, 31] are GRANTED in part and DENIED in part.  Plaintiff's first and third claims for relief are DISMISSED without prejudice for a lack of subject-matter jurisdiction.  Plaintiff's second and fourth claims for relief may proceed.

DATED March 31, 2010.

BY THE COURT:

s/Philip A. Brimmer_____
PHILIP A. BRIMMER
United States District Judge